Good morning. May it please the Court. My name is Brant Levine. I'm with the United States Department of Justice, and I represent Defendant Appellant Gerald Martin in this matter. If I may, I'd like to reserve three minutes of my time for rebuttal. Sure. Just keep an eye on the clock, and I'll try to help you, too. Certainly. Your Honors, the bulk of plaintiff's complaint in this matter focuses on alleged retaliation by NCIS generally and by various unnamed military police officers. But the complaint is barren with regards to alleged retaliatory conduct specifically by Agent Martin. And a bedrock principle of qualified immunity is that individual defendants can only be held liable for their own actions. And according to the complaint, the first time Agent Martin ever had any interaction with plaintiff was on July 23, 2009. But on that date, according to the complaint, Agent Martin received a report from a military police officer that plaintiff had used fraudulent credentials to enter Camp Pendleton. And in the qualified immunity context, the question is, what would a reasonable officer do in that situation? And the answer to that question is easy. A reasonable officer would investigate. It makes no difference what the occupation is of the person who allegedly tried to enter Camp Pendleton under false pretenses. Let's suppose we agree with you that so far, so good. He's called to the scene of this improper use of credentials, supposedly, and he's there to investigate it. So far, so good. Then she alleges that he shows up at her house and throws bogus papers at her. What do we do about that? Well, when you look at that next allegation, Your Honor, the second interaction that he had with her at her house, that citation, that references July 23, 2009. That same date that Agent Martin received a report from a law enforcement officer that plaintiff used fraudulent credentials to enter Camp Pendleton. So on that date, looking at the fact that that citation references that date, it is not a plausible inference that the only reason Agent Martin served that citation was for retaliation. Can you charge that offense by citation? You cannot charge that offense by citation. And we'll concede that that wasn't an error on the citation. And what about his conduct in throwing it at her and coming to her house to serve a bogus citation on her? Well, I'd be happy to address that, Your Honor. I think. Well, then do. Looking at that allegation that he went to her house, she refused to take the citation, and he threw it at her. He pounded the door so hard, a window broke on that. I would say that most of that evidence is unprofessional conduct. It doesn't rise to the level of a constitutional tort. Again, with the elements of retaliation, plaintiff has the burden at this stage of alleging facts to show plausibly that Agent Martin would not have thrown that at the door, thrown that at her, broken the window, but for an intent to retaliate because of her First Amendment speech. And again, this goes back to that first statement. Well, isn't it his job to know that you cannot charge a crime except by indictment? It may be, Your Honor, but also qualified immunity protects mistakes by officers. Officers make mistakes. That's not an ordinary mistake. That's fundamental to his work. Well, fundamental to his work is serving a citation, and if there's a technical error on that citation, I think that's the type of mistake that qualified immunity protects. And again, getting back to is there a plausible inference but for retaliation here, according to the complaint, the first interaction Agent Martin had with plaintiff was on that military base that day. So then, again, the question is, is there a plausible inference that he made a mistake with that citation, or even that he did it intentionally, but for an intent to retaliate? And the answer to that question is no, because this all ties back to that incident on July 23, 2009, when Agent Martin received a report from that law enforcement officer. Was he following the ordinary procedures when there is a complaint of fraudulent entry? And also, the police officers on the day of the incident searched her entire car and found no evidence of any fraudulent documents at all. And it's also true that you can go on to Camp Pendleton by just showing your driver's license, which she had. I think that brings up two issues. You know, the first issue, she said, I can get on to Camp Pendleton, why would I present false credentials? And I would submit to you that a reasonable officer, even if that officer is 95 percent sure that somebody didn't use false credentials to enter Camp Pendleton, based on that 5 percent chance, any reasonable officer is still going to investigate, because in this day and age, you can't take any chance that somebody is arriving on a restricted-access military installation under false pretenses. But his investigation would have clung to stone clearly that she was somebody who was on camp, the premises of Camp Pendleton, often. I think it's also important to note on that date, on July 23, plaintiff notes that another officer seized her credentials from the Defense Intelligence Agency. And the Defense Intelligence, according to plaintiff's complaint, instructed that those credentials be confiscated. So it could also be, as plaintiff notes in her complaint, that they were investigating her for not just impersonating an NCIS agent, but falsely using those DIA credentials. Yet, according to plaintiff's complaint, she was stopped on Camp Pendleton and asked about her credentials four times over several months. But Agent Martin was only involved in one of those instances. And the one instance that Agent Martin was involved, he arrived one hour and 45 minutes after the search was done, and within 15 minutes after Agent Martin arrived, according to the complaint, plaintiff was free to go. So this raises the question that even if there's some plausible inference of retaliation, would a reasonable officer in Agent Martin's position be unnoticed that this type of activity could subject him to personal liability under the First Amendment? And even making a mistake on a citation, throwing it at somebody, again, that at most evidence is unprofessional conduct. And as the Supreme Court stated in Wilkie, just because an officer acts with malice in his heart, doesn't necessarily mean that that officer's actions are unconstitutional or retaliatory. But the question is, would this have been done anyway? Can plaintiff show that but for these events, Agent Martin was not involved? This is a motion to dismiss, right? It is. So don't we view the allegations in the complaint as true? You certainly view the allegations in the complaint in the light most favorable to plaintiff. But the essential elements of a retaliation claim must be pled. I don't think you can infer elements of plaintiff's claim that aren't in there. And the question is, how is Agent Martin aware, according to the complaint, that plaintiff was engaged in a First Amendment activity? He was aware because he was aware of the Nash case, and that she was defending people who were being court-martialed. She was on the opposite side of the police in that case. He was aware of the Nash case. Well, the Nash case, the proceedings that we've put in the record, those proceedings occurred in November 2009. So that was after this alleged retaliation. In November 2009, plaintiff's client filed a motion in military court saying NCIS is harassing me. You know, this is unlawful command influence. And in November 2009 the incident at her home took place in May 2010. It did. And I think that even helps our case even more because that's over six months later. Right. So he was well aware of her work investigating and defending people who were being court-martialed by people like Officer Martin as of May 2010 when he took a bogus certification to her house and claimed she was being arrested or whatever he was claiming. Well, I'm not sure that's a fair inference from the Nash proceedings that we attached here. Agent Martin was listed as a possible rebuttal witness by the prosecution to rebut plaintiff's claims of harassment. I don't know that it's a fair inference to infer that Agent Martin was aware of all of plaintiff's past defense work from that. But even if you could infer that, again, we have a six-month time period. I don't think it's a plausible inference that the sole reason that Agent Martin served that admittedly invalid citation is to retaliate against her because her client had filed a motion six months before in military court. So it seems to me that you're arguing facts and inferences from facts and not that she failed to state a claim. I think it is that she failed to state a claim because, you know, it would be one thing, Your Honor, if this were a case where plaintiff had testified against Agent Martin in a case well before all this happened. And if you look at all the cases that plaintiff cited in her brief, there's no dispute that at the time of the alleged retaliation, the defendant was aware of plaintiff's First Amendment conduct. And we don't have that in this case. All we have is these Nash proceedings which occurred after the bulk of the retaliation. And the plaintiff's complaint is focused on what happened on Camp Pendleton, being stopped multiple times, her credentials being seized. Now, is your client, is he a member of the military? He is not, Your Honor. It's not a complaint, but he is a civilian. He is a civilian. And even though he is a civilian and plaintiff is a civilian, I think this does bring into our special factors argument. I think a fundamental error of the district court here is it relied on the Gibson case to infer a new to hold that a Bivens remedy is allowed here. But the Gibson case only holds that a Bivens remedy is available in some circumstances.  These are not the facts. But suppose they alleged that your guy said to her, you know, you've been a thorn in my side for months because of all your defense work. I'm going to stick it to you. Would she have stated a Bivens remedy? I think there are two questions. One, would she have stated a claim for retaliation? And under your hypothetical, probably. But then there's the threshold question, should you even infer a Bivens remedy? And the Supreme Court has said no, even in situations where it's very clear somebody was wrong, very clear that somebody would have no other remedy. But the Supreme Court has stated a Bivens remedy is not an automatic right. If the facts were, Carolyn, I'm going to charge you with a bogus crime because I hate you and because of what you've done, you're saying that that would not be a Bivens remedy, she wouldn't have a Bivens remedy? I think we'd have to look more closely at the facts here. Because we're not saying, Your Honor, that a Bivens remedy should never be allowed against NCIS agents or a Bivens remedy should never be allowed against the military. What we're saying is looking at the specific context of this case, would a district court have to intrude onto affairs that are traditionally given to the military? And in this case, who gets on a military base, how they get on a military base, who investigates people who get on a military base who maybe shouldn't be there? These are areas traditionally left to the military. And the Supreme Court in Cafeteria Workers v. McElroy noted the historically unquestioned power of a commanding general to exclude civilians from his base. So I think in this case, the fact that this case involves base security on a restricted military base, that is a special factor that counsels need to consider. She had a right to be there when she was participating in these legal proceedings. In other arguments, she didn't have a right to go and assist in the defense of various people being prosecuted by the military. Well, Your Honor, under base regulations, she was allowed to do that. But, again, base regulations can change. A military commander can bar people. They were changed. She had a right to be there to conduct the investigation and to assist in the defense. I would say there's nothing in the regulations or in the case law that gives anyone an unfettered right to enter a restricted access military installation. You know, if she needs to meet with her clients, she has been allowed to do that. But there could be arrangements made for her to meet off base if necessary. I think these types of questions that you're asking... But we're not talking about this case. In this case, she was allowed to go on to the base to investigate. All she had to do was show her driver's license, and she was hired by defense attorneys. I think that's correct. But what if she didn't show her driver's license, as the military police officer reported? When Agent Martin gets that information, he needs to act on it, as any reasonable officer would. And they did. They went and they searched her car and found no evidence of a fraudulent certification. That's right, and they did also seize her PIA credentials. Yet he nevertheless later cited her for that. And the other question I have, it seems kind of strange, is how difficult of an investigation is this? Don't you just go to the guy and let her onto the base and say, what did she show you? It's a fair question how long an investigation really takes, but I think what is unfair and not appropriate in the qualified immunity context is to lay all this at the feet of Agent Martin, that there's nothing that complaints allege that he was prolonged... But it's not all of it. He's just the one that she chose to sue. That's right. That doesn't mean she couldn't have sued someone else. And she has sued other people, and I think that's part of our argument, is that she does have an alternative remedy. And if I may reserve the remaining time for rebuttal. You bet. You've got about a minute and a half left. Good morning. Good morning, Your Honors. Sean Randin for the plaintiff and appellate, Agent Martin. May it please the Court. Special Agent Martin is essentially attempting to sanitize the record by disaggregating some of the incidents in which he participated, as well as suggesting that the Court ought to essentially draw inferences in his favor, which, of course, is exactly the opposite of what ought to happen at this stage, where the Court takes the record as a whole, looks at the facts in the light most favorable to the plaintiff, and draws all reasonable inferences in her favor. Now, there are six core facts that plausibly show why Special Agent Martin had a retaliatory motive towards the plaintiff. Now, all we have to do at this stage is show that retaliation was a substantial motivating factor, and then eventually, down the line, the burden will shift and Special Agent Martin can try to overcome that. So those are the six core facts. Special Agent Martin was, during the relevant period, as this Court understands, an NCIS officer in the San Diego region. During the same relevant period, Carol Martin, the plaintiff, was a military defense investigator also in the San Diego region. Third, the plaintiff was the only person performing these functions in the region. Fourth, on multiple occasions, plaintiffs offered testimony either against NCIS directly or in a way that would have challenged the prosecution more generally, which NCIS works for. Fifth, the chronology of events shows that Special Agent Martin's course of retaliatory conduct against plaintiff began shortly after she repeatedly testified in the Nash proceeding with Judge Wardlaw. Let me stop you there. As I understand what they've alleged, and as Judge Wardlaw has pointed out, we're on a motion to dismiss, not summary judgment. As I understand it, what they allege is that Agent Martin got involved in this when he was called to the scene of what other officers deemed to be an infraction of some sort. Is that true? On the record we have now, yes, that's right. Okay, so at that point, has he done anything wrong, anything actionable, even though she's an investigator and he's on the other side of these cases? So far, he's called to the scene of a crime or what is reported to him as a crime. So far, so good? I'm not sure it is so far, so good, Your Honor, because the staff- You're telling me he would be liable if he gets a call at headquarters and says, we've stopped somebody, come down and investigate. He could be sued for that? He's not entitled to immunity for that? Your Honor, we do need to look at the record as a whole here, and I'm not suggesting that if we isolate that incident that the plaintiff would necessarily have- I'm trying to figure out where the wrong starts. I think I hear you saying he hadn't done anything wrong at that point, responding to a call. Your Honor, to draw the reasonable inferences in plaintiff's favor, the court could, in fact, determine that he did something wrong at that point because that stop itself was unreasonably- He didn't do the stop. He did arrive at the scene- That's what I'm saying. Okay, so you're fighting the facts. He didn't do the stop. He wasn't there initially. Okay, he's called to the scene. Right. Is there anything wrong with him responding to the scene? No, Your Honor. Okay. Then someone has seized her credentials and had given them to him, right? Anything illegal about that? Not necessarily in that in itself, Your Honor, but I would like to draw the court's attention to the fact that he confiscated her DIA credentials at that point and refused to allow her to call the sponsoring entity to try to sort that out. Okay. She was in a helpless position at that point, and he did nothing to try to facilitate her resolving whatever issue there was related to the DIA credentials. Now, how do we show that that was because he was retaliating against her and not some other impropriety on his part? Well, Your Honor, because retaliation at the pleading stage so often lacks a smoking gun, we needed to look at the record as a whole and the whole course of conduct. And based on the record, there are a number of discrete acts that Special Agent Martin performed that taken together plausibly show retaliatory motive. He strikes her in the face. No, no, that's once later, right? It is later. Okay. I'm talking about at the scene. The guy seizes her credentials, gives it to Agent Martin. So far okay? Well, just in terms of him receiving her credentials, yes. Okay. Then I guess we fast forward and a few months later he shows up at her house. Approximately ten months later, Your Honor. Okay. He knocks on the door. The complaint alleges she declines to or doesn't answer the door. Well, she did answer the door initially after repeated doorbell ringing and pounding. Because she said she was in the shower. That's right. Okay, so you can understand why somebody would keep banging on the door if nobody answers the door, I suppose, if she's in the shower. But anyway. I know you might give up. You might give up. In any event, there's a delay in answering the door. That's what we know for sure from the complaint. A delay of no more than a few minutes, I think, according to the facts of the complaint, Your Honor. According to the complaint, she comes to the door. He wants to give her the papers. According to her complaint, she declines to accept them. That's right, Your Honor. Okay. What should he do then? Well, Your Honor, the entire citation is apparently bogus or fraudulent. I mean, a law enforcement officer has no particular interest or right to serve fraudulent or pathetic papers. Granted. But we have to show retaliation, not abuse of process or excessive force. This is we're in a retaliation case. Okay. She refuses to take the papers. What happens then? He throws the papers at her, and they struck him in the face. Now, that's not nice, but is that retaliation or is that excessive force or what? Well, again, Your Honor, on the whole course of conduct, there's a plausible case of retaliation. And Special Agent Martin, you know, does attempt to isolate each of these incidents and try to explain them away. But in addition to the highly offensive things that he did in her house, which include that same morning coming back to again bother her and breaking a window in her door, there was earlier conduct where he had reported her to the state agency that licenses private investigators to report that NCIS wasn't investigating her. There's an allegation in the complaint that he did that? Yes, there is, Your Honor. And there's also a document, a record. It's a record, page 48, Special Agent Martin included, that indicates that he directly contacted that agency to report that NCIS was investigating her. What's wrong with that? Well, again, Your Honor, this goes to in whose favor inferences are drawn. One, if inferences are to be drawn in Special Agent Martin's favor at this point, then there's a potentially reasonable explanation. Let's assume we take as a given that he's reported to an agency that they're investigating her for misusing her credentials. If it's true that they're investigating her for misusing her credentials, what's wrong with that? Well, again, Your Honor, it's something that in the course of a larger conduct that he engaged in shows an intent to harass her. When you report somebody to a state agency, it's clear that there's going to be a potential adverse effect on their career. And that goes to the crux of what's wrong here, is that Special Agent Martin and his associates were attempting to chill plaintiff's speech through this retaliatory course of harassment and intimidation, which included not just his contacting the state agency, and Special Agent Martin I'm just worried how we could hold that a law enforcement agent can't communicate with other law enforcement agencies that there's an ongoing investigation about a particular individual. I don't see how we could. I wouldn't feel comfortable holding that. Perhaps not in isolation. That's understandable. But let's look at the investigation here. And the panel has already addressed this to some degree with counsel for Special Agent Martin. But this is an investigation involving an apparently discreet alleged incident of a misuse of credentials that at the very least remained pending according to pleading spot in this case 15 months after the incident in question. The military judge in the Nash case, when addressing the question of unlawful command influence, was incredulous in November of 2009, which was a mere four months after the alleged incident, that an investigation of that incident might still be ongoing. And when you have law enforcement apparently drawing out an investigation without any that investigation is not legitimate and is, in fact, designed to chill the target of the investigation's protected speech. Your Honor, I'd like to address the ‑‑ Can I ask a question? Has any ‑‑ how much discovery has happened in this case? We've had a reasonable amount of paper discovery, Your Honor. But because of prolonged requests for stays that Special Agent Martin has made and some discovery disputes that the parties have been litigating, we have not taken a whole lot of depositions in the case. Because what Judge Hayes actually held was that Agent Martin is not entitled to qualified immunity at this stage of the proceedings and that that claim is more appropriately resolved at summary judgment. As opposed to the motion to dismiss stage of proceedings. And I'm assuming what he's getting at there is that he wants to see what's going to be proven up. I mean, we have the allegations and the complaint. Let's see what discovery shows. Right now we draw the inferences in her favor. Now let's see what the facts are. We're just determining whether there's a plausible claim right now. That's right, Your Honor. And especially in a retaliation claim, developing the record is going to be very important because the burden, once plaintiff has plausibly come forward and shown that retaliation was a substantial and motivating factor, the burden will then shift at the summary judgment and trial stages to Special Agent Martin to try to show that this investigation was legitimate. And on a fully developed record, the Court will be able to look at that as a whole and make a full and fair decision of not just whether a claim is misstated, but whether qualified immunity ought to appeal. The Bivens questions are not nearly as difficult as Special Agent Martin makes them out to be here. We don't have a case, as Judge Wardlaw recognized, where an individual was barred from a base. Therefore, this case is not like Greer, Albertini, or cafeteria workers, where there's a command decision to bar somebody from a base. Rather, we have garden-variety law enforcement retaliation by a civilian against a civilian that occurred both on and off military bases all the way to a civilian's home. Were Special Agent Martin to prevail on this idea that a Bivens remedy is not available under these circumstances, then it would essentially license unscrupulous military law enforcement officers to retaliate against people based on their protected speech, even off of bases. And that would be a major departure from existing Bivens special factor analysis in the military context. There are only two circumstances where courts have found a Bivens remedy is inapplicable in the military context. One is where it implicates active duty of service members. And the second is where it implicates high-level policy decisions made by executive military leaders. And this case is obviously far from those circumstances. Your Honor, I'd like to address just a few of the other issues that were raised in the reply brief. Can I ask another question on this investigation? Is it allegedly still ongoing? Well, Your Honor, I mean, we have received some discovery that has shed light on that question. And I'm happy to sort of explain where I think that might be. But we haven't completed depositions yet. So I'd be sort of venturing a little bit of a guess on that. Then don't. Your Honor, in the reply brief, Special Agent Martin says that plaintiff's argument that affirmative defenses have to be put off for later in these types of proceedings is improper because of the Supreme Court's case Hartman v. Moore. That's not true. Hartman really just crafts a special rule for cases where probable cause is apparent on the face of the complaint. And it's a retaliatory prosecution claim. This is not a retaliatory prosecution claim. And taking the reasonable inferences in plaintiff's favor in any event, probable cause to believe that she may have violated one of these provisions of law is not applicable. In terms of the timing of affirmative defenses, Special Agent Martin raises the example of a statute of limitations defense. And plaintiff doesn't quarrel with the idea that if an affirmative defense is completely apparent from the face of a complaint, that an affirmative defense might become a part of the 12b-6 process. But we don't have that here. Instead, what we have is a disputed set of facts that would go to the affirmative defense, namely whether the investigation was legitimate or not. And the Ninth Circuit actually addressed this in a case called Scott v. Coleman, 746 F.T.D. 1377, and said that only when a defense raises something that's not a disputed issue of fact can it be brought forward on a motion to dismiss. Finally, the APA. You're down to about four seconds, so finish your thought if you would. Okay. Thanks. Well, let me just go there. In the event that the Court were to credit Special Agent Martin's argument that the complaint should be dismissed for failure to state a claim, we would hope that the panel would allow plaintiffs to amend the complaint. Great. Thank you very much. Thank you. We've got about a minute and change left. Sure. Two quick issues that I'd like to respond to. First, I want to correct a misstatement of the record. Agent Martin did not report plaintiff to the California State Agency. If you look at page 48 of the record, you'll see that Captain Barnett, the prosecutor in the Nash case, reported plaintiff to that agency for working as an unlicensed private investigator. And in response to that complaint, the state agency contacted Agent Martin. And that's when Agent Martin told that state agency that NCIS was investigating her for misuse of federal credentials. And the other thing I'd like to briefly respond to is the clearly established law. That even if at this point in the case you conclude that plaintiff has put forth a plausible allegation of retaliation, that still doesn't mean that the district court should be reversed. We should still win this case because there is no clearly established law that would have put Agent Martin on notice that the activities were unconstitutional. Plaintiffs can't just do that. Let me wait, wait, wait a minute. The heart and soul of their case is that they trumped up a charge against her to retaliate against her. Are you arguing that it's not clearly established that they can't do that? In this circumstance, yes. What plaintiff's counsel said is that the crux of this case is that these actions are impinging on her right to, that they affect her career. And is there First Amendment, is there clearly established case law that somebody has a First Amendment right to work as a military criminal defense investigator? I mean, one recent case that this Court decided was the Ellens case, Ellens v. City of Sierra Madre. And in that case, in addressing clearly established law, the Court noted that there was case law in the Ninth Circuit that police union representatives, that their speech is protected by the First Amendment. But in this case, there is no similar case law that would have put Agent Martin on notice that plaintiff had a First Amendment right to work as a criminal defense investigator. So because of this, even if you were to find a plausible allegation of retaliation, that Agent Martin still is not on notice, that the three actions that he took, and again, we're talking about three actions, that those three actions would have violated plaintiff's constitutional rights. Thank you. Thank you, Mr. Reardon, as well. The case just argued is submitted. Good morning.
judges: Cedarbaum, Silverman, Wardlaw